# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**ROBERT ROTUNNO,**

    **Plaintiff,**

**v.**                                      **No. CIV 99-1011 MV/LCS**

**KENNETH S. APFEL,**
**COMMISSIONER OF SOCIAL SECURITY,**

    **Defendant.**

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

    **THIS MATTER** came before the Court upon Plaintiff's Motion to Reverse and Remand for a Rehearing (Doc. 7), filed May 3, 2000. The Commissioner of Social Security issued a final decision denying Plaintiff's application for disability insurance benefits. The United States Magistrate Judge, having considered the Motion, the memoranda submitted by the parties, the administrative record and the applicable law, finds that the motion is not well-taken and recommends that it be **DENIED**.

### PROPOSED FINDINGS

    1.    Plaintiff, now sixty-four years old, filed his application for disability insurance benefits on January 17, 1995, alleging a disability since October, 1985, due to injuries to his right shoulder, right knee, and back. (R. at 39-42; 63.) He has a tenth grade education with past relevant work as a carpenter. (R. at 63-67.)

    2.    Plaintiff's application for disability insurance benefits was denied at the initial level on

February 25, 1995, (R. at 43.), and at the reconsideration level on April 11, 1995. (R. at 50.) Plaintiff appealed the denial of his claim by filing a Request for Hearing by Administrative Law Judge on May 22, 1995. (R. at 54.) Administrative Law Judge Bivins held a hearing on October 16, 1995, (R. at 206), and issued his decision on May 15, 1996. (R. at 25.) Plaintiff filed a request for review on August 13, 1996. (R. at 20.) The Appeals Council denied the request for review on October 2, 1997. (R. at 3-4). Plaintiff filed an action for judicial review with this Court on October 22, 1997, pursuant to 42 U.S.C. § 405(g). The Commissioner stipulated to a limited remand for the purpose of conducting a new hearing, entering additional evidence, and obtaining vocational expert testimony.

3. The second hearing was held on February 26, 1999, before ALJ Pedron ("ALJ"), who heard testimony from Plaintiff and Gerald Belchick, a vocational expert (VE). (R. at 244.) In his decision, issued May 19, 1999, the ALJ determined that Plaintiff had disability insured status through March 31, 1987. (R. at 238.) The ALJ analyzed Plaintiff's claim according to the sequential analysis set forth in 20 C.F.R. § 404.1520(a)-(f) and *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993). At the first step of the sequential evaluation process, the ALJ found that Plaintiff had not engaged in substantial gainful activity between his alleged onset date and the expiration of his disability insured status. (*Id.*) At the second step, the ALJ determined that Plaintiff had severe impairments consisting of residuals of injuries to his right shoulder and right knee and degenerative lubrosacral disc disease. (*Id.*) At the third step of the sequential analysis, the ALJ found that the severity of Plaintiff's impairments had not met or equaled any of the impairments found in the Listing of Impairments, Appendix 1 to Subpart P, 20 C.F.R. §§ 404.1501-.1599. *See id.* The ALJ then found that Plaintiff had the residual functional capacity for work activities allowing him to alternate sitting, standing and walking throughout the workday that required no overhead reaching and no

lifting in excess of forty-five pounds. (R. at 239-40.) The ALJ further found that non-exertional factors did not limit Plaintiff's residual functional capacity. (R. at 240.) At the fourth step of the analysis, the ALJ determined that Plaintiff was unable to perform his past relevant work. (R. at 241.) At step five, relying on the testimony of the VE, the ALJ determined that Plaintiff was able to perform the job of lobby or gate guard. (R. at 241.) Thus, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.

4. On June 1, 1999, the Appeals Council issued a letter providing that the decision of the ALJ would become the final decision sixty-one days later, and that Plaintiff had sixty days thereafter to file suit pursuant to 20 C.F.R. §404.984. (R. at 233.) Thus, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes upon expiration of the sixty days. Plaintiff timely filed suit in this Court on September 9, 1999. Plaintiff seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §405(g).

**Standard of Review**

5. The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *See Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Evidence is substantial if "a reasonable mind might accept [it] as adequate to support a conclusion." *Andrade v. Secretary of Health and Human Svcs.*, 985 F.2d 1045, 1047 (10th Cir. 1993) (quoting *Broadbent v. Harris*, 698 F.2d 407, 414 (10th Cir. 1983) (citation omitted)). A decision of an ALJ is not supported by substantial evidence if the evidence supporting the decision is overwhelmed by other evidence on the record. *See Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988).

6. In order to qualify for disability insurance benefits, a claimant must establish a severe

3

physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *See* 42 U.S.C. §423(d)(1)(A); *Thompson v. Sullivan*, 987 F.2d at 1486. The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. *See* 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *See Thompson v. Sullivan*, 987 F.2d at 1487.

7. At the first four levels of the sequential evaluation process, the claimant must show he is not engaged in substantial gainful employment, he has an impairment or combination of impairments severe enough to limit his ability to do basic work activities, and his impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *See id.*

**Administrative Record**

8. On August 28, 1985, Plaintiff underwent gall bladder surgery without complication. (R. at 164.) On October 19, 1985, Plaintiff fell while working, fracturing his right fourth rib and injuring his right shoulder and knee. (R. at 196-97.) Plaintiff was initially sent to physical therapy three times a week. (R. at 81.) On October 30, 1985, Michael Rothman, M.D., an orthopedic surgeon, observed that the knee was much improved with therapy and that it had a full range of motion and stable ligaments. (*Id.*) On November 17, 1985, Plaintiff reported that his shoulder pain

4

had decreased. (R. at 79.) Dr. Rothman recommended that Plaintiff continue physical therapy and swimming at his spa. (*Id.*)

9. On December 3, 1985, Dr. Rothman noted that the right knee was improving and Plaintiff could squat. (R. at 80.) On December 19, 1985, Plaintiff reported that his right shoulder was bothering him quite a bit and he had occasional numbness in his right fingers. (*Id.*) On December 26, 1985, Plaintiff was still having a lot of pain in his shoulder and numbness through his right hand. (*Id.*) Dr. Rothman referred Plaintiff to Dr. Baten for a neurological evaluation. (*Id.*)

10. On January 6, 1986, Dr. Rothman noted that Dr. Baten found no neurological deficits in Plaintiff's right arm. (R. at 84.) Dr. Rothman also opined that, despite aggressive physical therapy, Plaintiff's improvement had reached a plateau, and he recommended surgery. (R. at 84.) On January 13, 1986, Dr. Rothman performed arthoscopic medial meniscopy of the right knee and arthoscopic debridement of the right shoulder. (R. at 87-89.)

11. One week later, Plaintiff reported that his knee and shoulder were feeling much better. (R. at 84.) Dr. Rothman noted that Plaintiff was able to put full weight on his right knee, which had 90 degrees of motion. (*Id.*) The right shoulder was still stiff, but Plaintiff's fingers were no longer numb. (*Id.*) Dr. Rothman placed Plaintiff on physical therapy. (*Id.*)

12. On February 21, 1986, Dr. Rothman found that the knee was "progressing very nicely" and had a full range of motion with slight discomfort. (R. at 84.) The shoulder had about 70 degrees of active abduction with a fair amount of pain and cracking. (*Id.*) On March 25, 1986, Dr. Rothman found that Plaintiff's knee was feeling better with a full range of motion and Plaintiff's thigh muscles were more toned up. (R. at 83.) The degree of abduction in Plaintiff's shoulder was about the same and Plaintiff reported general pain. (*Id.*) Dr. Rothman noted that Plaintiff had degenerative changes

5

in his shoulder and that these degenerative changes lessened the prognosis for a total satisfactory recovery. (*Id.*)

13.	On April 25, 1986, Dr. Rothman observed that Plaintiff's knee had a good range of motion and stability and that the right shoulder was improving with therapy. (R. at 83.) Plaintiff was able to reach overhead to about 140-150 degrees and abduction straight to the side was 80 degrees. (*Id.*) On May 22, 1986, Dr. Rothman administered an injection of xylocaine and marcaine to Plaintiff's shoulder, which did not provide much relief. (*Id.*) On May 30, 1986, Dr. Rothman diagnosed degenerative and traumatic arthritis of the right shoulder with frozen shoulder syndrome. (*Id.*) On August 18, 1986, Dr. Rothman opined that Plaintiff's knee surgery had yielded good results and noted that there was some improvement in the degenerative arthritis in the shoulder and that he might benefit from shoulder manipulation under anesthesia. (R. at 196-97.)

14.	On August 19, 1986, Dr. Rothman manipulated Plaintiff's shoulder under anesthesia. (R. at 136; 196-98.) During the procedure, Dr. Rothman found an easy range of motion with very few adhesions and no mechanical blockage. (*Id.*) On September 26, 1986, the right shoulder was moving little easier with a little less pain. (R. at 82.) However, Plaintiff's range of motion in his shoulder was limited to 70 degrees with pain and crepitation. (*Id.*) His right knee was doing "pretty well" but "aching once in a while." (R. at 82.) On October 22, 1986, Dr. Rothman noted that Plaintiff's right shoulder pain was decreasing and the range of motion was 80 degrees. (*Id.*)

15.	On October 22, 1986, Plaintiff reported to Dr. Rothman that he developed low back pain and sciatica after a long drive. (R. at 82.) Dr. Rothman observed a positive straight leg raising test and muscle spasm in the lower back and diagnosed lower back strain. (*Id.*) On November 17, 1985, Plaintiff reported less pain in his right shoulder but the range of motion was still limited. (R.

6

at 79.) Dr. Rothman recommended that Plaintiff continue swimming and spa exercises. (*Id.*) On December 19, 1986, Dr. Rothman noted that an x-ray of Plaintiff's shoulder indicated that it was unchanged. (*Id.*)

16. In July, 1988, Plaintiff underwent ventral hernia repair without complication. (R. at 193-94.)

17. From February, 1990, to August, 1996, Dr. Sandoval, a massage therapist, doctor of naturopathy and foot reflexologist, sporadically treated Plaintiff for lower back pain, leg pain and right shoulder range of motion. (R. at 316-17.) On August 12, 1996, Dr. Sandoval stated that Plaintiff's condition was worsening due to arthritis and erosion of cartilage. (*Id.*) Dr. Sandoval also wrote that Plaintiff had degeneration in the lumbar discs and a severe loss in range of motion in the right shoulder, causing him constant pain "while working and even while sleeping." (*Id.*)

18. On February 2, 1993, Plaintiff was examined by Dr. Hurley, an orthopedic surgeon, for pain in the right shoulder and knee. (R. at 151.) Dr. Hurley diagnosed degenerative osteoarthritis in the right shoulder and observed the Plaintiff would be a good candidate for total shoulder replacement. (*Id.*) At the same time, Dr. Hurley noted the knee "was not too bad" with degenerative changes. (*Id.*) On March 16, 1993, Dr. Hurley stated that Plaintiff had done well, had no need for medication, and was working on his home. (R. at 151) Dr. Hurley wrote that Plaintiff liked to "work with adobe" and was "building himself a new little house and the alfalfa was coming in so things are satisfactory." (*Id.*)

19. A September 25, 1995, Plaintiff saw David Macias, M.D. (R. at 339.) Dr. Macias noted that x-ray revealed findings consistent with moderate to severe degenerative disc disease at L5-S1 level. (R. at 200.) On October 26, 1995, Dr. Macias opined that Plaintiff was suffered from

7

severe degenerative lumbar disc disease which rendered him unemployable. (R. at 205.) Dr. Macias also wrote that Plaintiff required regular medical attention and daily medication. (*Id.*) Dr. Macias did not expect Plaintiff's condition to significantly improve. (*Id.*)

20. On August 20, 1996, Dr. Macias completed a residual functional capacity assessment. (R. at 329-31). Dr. Macias found that Plaintiff was able to sit for three hours, stand for four hours and walk for four hours total an eight-hour work day. (R. at 330.) Dr. Macias stated that Plaintiff was able to lift up to five pounds continuously, up to twenty-five pounds frequently, and up to one hundred pounds occasionally. (*Id.*) Plaintiff could do simple grasping and fine manipulation, but could not push and pull arm and leg controls. (*Id.*) Dr. Macias opined that Plaintiff could frequently bend, never squat, and occasionally crawl, climb, and reach. (R. at 331.) Dr. Macias stated that Plaintiff had a total restriction from working around unprotected heights, a moderate restriction for working around moving machinery, and a mild restriction from driving and exposure to marked changes in temperature and humidity. (*Id.*) On August 25, 1998, Dr. Soldatis, a consultative physician, diagnosed severe osteoarthritis of the right shoulder. (R. at 319.)

21. At the hearing of February 26, 1999, Plaintiff testified that, after his injury in 1985, he was using crutches for most of the time, "probably of a couple of years," and could only walk one block. (R. at 271-72.) He also testified that he still used crutches occasionally, and had used a cane off and on since the time of the injury. (R. at 273.) Plaintiff appeared at the hearing with a cane. (*Id.*) Plaintiff also testified that he worked for the New Mexico legislature for thirty days in 1995, sixty days in 1996, and thirty days in 1997. (R. at 256.) He testified that, in March, 1987, he could not lift more than five pounds and would spend about two to three hours a day lying down. (R. at 272.)

8

22. The ALJ asked the VE to assume an individual with the same vocational characteristics as Plaintiff with the residual functional capacity for work activities allowing him to alternate sitting, standing and walking throughout the workday that required no overhead reaching and no lifting in excess of 45 pounds. (R. at 281.) In response to the ALJ's fist hypothetical question, the VE testified that Plaintiff could perform the jobs of gate or lobby guard. (R. at 281-82.) The ALJ asked the VE to assume the restrictions in Dr. Macias' report. (R. at 283.) Based on the restrictions contained in Dr. Macias' residual functional capacity assessment, the VE testified that Plaintiff could still perform this occupations. (R. at 283-84.) The VE further testified that the use of a cane would not preclude Plaintiff from performing these jobs. (R. at 285; 287.)

**Discussion**

23. Plaintiff raises the following arguments in support of his Motion to Reverse or Remand the Administrative Agency Decision. First, Plaintiff contends that the ALJ erred in assessing his credibility. Second, Plaintiff argues that the ALJ erred in his assessment of his residual functional capacity. Finally, Plaintiff argues the ALJ erred in failing to take notice of the finding of disability by the New Mexico Workers' Compensation Administration.

24. Plaintiff first contends that the ALJ erred in assessing his credibility. Specifically, Plaintiff asserts that the ALJ misrepresented and misstated evidence. "Credibility determinations are peculiarly the province of the finder of fact," and will not be overturned if supported by substantial evidence. *Diaz v. Secretary of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir.1990). Plaintiff established that he suffers from a pain-producing impairment. Therefore, the ALJ was required to consider his complaints of pain by evaluating his use of pain medication, his attempts (medical or non-medical) to obtain relief, the frequency of his medical contacts, and the nature of his daily activities,

9

as well as subjective measures of credibility including the consistency or compatibility of non-medical testimony with the objective medical evidence. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir.1995). The ALJ considered these factors in his decision and determined that Plaintiff's testimony of subjective complaints and functional limitations was not supported by the evidence as a whole to the disabling degree alleged and therefore lacked credibility. (R. at 239.)

25. Specifically, with respect to the credibility issue, Plaintiff contends that the ALJ misrepresented the evidence as to his daily activities. The ALJ noted that Plaintiff performed repair and maintenance work on his rental houses during the relevant period. Plaintiff testified that, after his October, 1985 injury, he had worked mostly on his own, buying properties, remodeling them, and renting them out. (R. at 210; 216.) Plaintiff testified that he had performed all aspects of construction, from the foundation footings to completion. (R. at 215-16.) He also testified that he had recently remodeled his basement, fixed-up his RV to rent, and did a lot of yard work. (R. at 229.) The ALJ also observed that, in 1993, Plaintiff indicated he required no pain medication, was building an adobe house, bringing in an alfalfa crop, and reported few restrictions of his daily activities. (R. at 239.) On March 16, 1993, Dr. Hurley stated that Plaintiff had done well, had no need for medication, and was working on his home. (*Id.*) Dr. Hurley wrote that Plaintiff liked to "work with adobe" and was "building himself a new little house and the alfalfa was coming in so things are satisfactory." (*Id.*)

26. The nature of a claimant's daily activities is an appropriate factor in the disabling pain credibility analysis. *See Kepler*, 68 F.3d at 391. Substantial evidence supports the ALJ's finding that Plaintiff performed repair and maintenance work on his rental houses during the relevant period. The ALJ properly considered the evidence regarding Plaintiff's daily activities in arriving at his

10

determination that his complaints of disabling pain lacked credibility.

27. Plaintiff also disagrees with the ALJ's finding that his testimony regarding the use of crutches was inconsistent with the medical record. Plaintiff testified that he was on crutches for a "couple of years" following his knee surgery in January, 1986. (R. at 271.) The ALJ noted that this testimony was inconsistent with the medical record. (R. at 239.) This finding is supported by substantial evidence In August, 1986, Dr. Rothman opined that Plaintiff had a "good result" from his knee surgery and his general physical condition was within normal limits, except for his right shoulder. (R. at 136-37.) On January 21, 1986, Dr. Rothman noted that Plaintiff was able to place full weight on his right knee and did not note that Plaintiff needed crutches. (R. at 84.) Subjective measures of credibility, including the consistency or compatibility of non-medical testimony with the objective medical evidence are valid factors in the disabling pain credibility analysis. *See Kepler*, 68 F.3d at 391. Substantial evidence supports the ALJ's finding that his testimony regarding the use of crutches was inconsistent with the medical record. The ALJ properly considered the inconsistency between Plaintiff's testimony with the medical record in determining that Plaintiff's complaints of disabling pain lacked credibility and the ALJ's findings are supported by substantial evidence.

28. Plaintiff asserts that the ALJ misrepresented the record regarding the lack of medical treatment. The ALJ noted that Plaintiff testified his knee symptoms had persisted from 1986 to the present and that he required no medical treatment for his knee after the arthroscopic surgery in January, 1986 and that he did not see a doctor for knee or shoulder complaints from November, 1986 to 1993. (R. at 239.) Although Plaintiff visited Dr. Sandoval, the massage therapist, doctor of naturopathy and foot reflexologist, in 1990, the ALJ was correct that the record contains to evidence of conventional medical treatment for the period between December, 1986 and 1993. The frequency

11

of a claimant's medical contacts is a valid factor for consideration in the disabling pain analysis. *See Kepler*, 68 F.3d at 391. Thus, the ALJ properly considered the evidence regarding the frequency of medical contacts in arriving at his determination that Plaintiff's his complaints of disabling pain lacked credibility and the ALJ's findings are supported by substantial evidence.

29.     Plaintiff takes issue with the ALJ's finding regarding his need for naps. The ALJ found that Plaintiff testified that he requires naps during the day, but did not report such a problem to any medical provider. (R. at 239.) Plaintiff testified that, as of March, 1987, when his disability insured status expired, he needed to spend about two to three hours lying down in bed during the day. (R. at 272; 278.) However, the medical record does not indicate that Plaintiff described this requirement to a doctor. The nature of a claimant's daily activities and inconsistency between testimony and medical evidence are appropriate factors in the ALJ's credibility determination. *See Kepler*, 68 F.3d at 391. Substantial evidence supports the ALJ's finding that Plaintiff's testimony that he took naps during the day was inconsistent with the medical record. The ALJ properly considered the inconsistency between Plaintiff's testimony and the medical record and properly considered Plaintiff's daily activities in arriving at the determination that Plaintiff lacked credibility.

30.     Plaintiff also finds fault with the ALJ's determination regarding his manual dexterity. The ALJ found that Plaintiff testified as to problems with his manual dexterity of his right hand, but there was no evidence that he had such an impairment of his right hand prior to the expiration of his insured status. Plaintiff testified that his right hand had been numb since a 1986 surgery and that he dropped things. (R. at 276.) On December 19 and 26, 1986, Dr. Rothman noted that Plaintiff reported occasional numbness of his right hand and fingers. (R. at 80.) However, Dr. Rothman did not record numbness during subsequent examinations. On January 6, 1986, Dr. Rothman stated that

Dr. Baten did not find any neurological deficits in Plaintiff's right arm. (R. at 84.) Moreover, in his residual functional capacity assessment, Dr. Macias found that Plaintiff was able to perform simple grasping and fine manipulation. (R. at 329-31) While the record establishes that Plaintiff had a restricted range of motion in his right shoulder, it did not indicate that Plaintiff had any problems with manual dexterity. (R. at 79-84.) The ALJ properly considered the inconsistency between Plaintiff's testimony and the medical record in determining that Plaintiff lacked credibility.

31. The ALJ properly considered the *Kepler* factors and determined that Plaintiff's complaints of disabling pain lacked credibility. Although Plaintiff asserts that the ALJ's findings misstate the evidence, a review of the record establishes that the ALJ's findings are accurate and entirely consistent with the record. The ALJ applied correct legal and standards and substantial evidence supports his determination that Plaintiff's complaints of disabling pain lacked credibility.

32. Plaintiff argues that the ALJ erred in assessing his residual functional capacity. The ALJ found that, prior to the expiration of his insured status, Plaintiff retained the residual functional capacity for work activities allowing him to alternate sitting, standing and walking throughout the workday that required no overhead reaching and no lifting in excess of 45 pounds. (R. at 239.) The ALJ further found that non-exertional limitations did not erode Plaintiff's residual functional capacity. (R. at 240.) This finding is supported by substantial evidence  Dr. Macias found that Plaintiff was able to sit for three hours, stand for four hours and walk for four hours total in an eight-hour work day, lift up to five pounds continuously, up to twenty-five pounds frequently, and up to one hundred pounds occasionally,  frequently bend, never squat, and occasionally crawl, climb, and reach. (R. at 331-33.) Dr. Macias also found that Plaintiff could do simple grasping and fine manipulation but could not push and pull arm and leg controls. (R. at 330-31). Dr. Rothman opined that Plaintiff's

13

knee surgery was successful and his shoulder was improving. (R. at 136-37.) Dr. Hurley observed that Plaintiff was doing well and had no need for medication. (R. at 151.) Substantial evidence of record supports the ALJ's residual functional capacity assessment and the ALJ applied correct legal standards.

33. Although not raised as a separate issue, Plaintiff argues in his brief that the ALJ's hypothetical questions were unsupported by the medical record. Hypothetical questions posed to a vocational expert need only reflect impairments and limitations supported by the record as found by the ALJ. *See Decker v. Chater*, 86 F.3d 953, 955 (10th Cir.1996). The ALJ asked the VE to assume an individual with the same vocational characteristics as Plaintiff with the residual functional capacity for work activities allowing him to alternate sitting, standing and walking throughout the workday that required no overhead reaching and no lifting in excess of forty-five pounds. (R. at 281.) The ALJ then asked the VE to assume the restrictions in Dr. Macias' report. (R. at 283.) The ALJ posed hypothetical questions to the VE that adequately reflected the nature and severity of Plaintiff's impairments as borne out by substantial evidence in the record. Therefore, the ALJ's hypothetical questions were proper and the VE's opinion that a substantial number of jobs existed in the national economy which Plaintiff could perform is supported by substantial evidence.

34. Plaintiff argues that the Commissioner failed to meet his burden at step five. At step five, the burden shifts to the Commissioner to prove that the claimant is not disabled. *See Miller v. Chater*, 99 F.3d 972, 975 (10th Cir.1996). At the hearing, the ALJ presented a hypothetical question to the VE, setting forth an individual of Plaintiff's age, education, and work experience and describing the limitations he found credible and supported by the evidence. *Cf. Talley v. Sullivan*, 908 F.2d 585, 588 (10th Cir.1990) (observing that a vocational expert's response to a hypothetical is not binding

14

on the ALJ if the question sets forth impairments which the ALJ does not accept as true). The VE responded that such an individual could perform the job of gate or lobby guard and that there were at least 70,000 of these positions in the national economy and 2,000 in New Mexico. (R. at 282.) The ALJ established the VE's education and experience, questioned him appropriately, and allowed Plaintiff's attorney the opportunity to cross-examine him. Under these circumstances, the testimony of the VE supplied substantial evidence of a significant number of positions which Plaintiff could perform and satisfied the Commissioner's burden at step five.

35. Plaintiff asserts that he should have been found disabled under the Grids at Section 201.01. *See* 20 C.F.R. § 404.1569 As the ALJ satisfied his burden at step five by relying on vocational expert testimony, reliance on the grids would be improper. *Cf. Ragland v. Shalala*, 992 F.2d 1056, 1057 (10th Cir.1993) (burden at step five satisfied by producing expert vocational testimony or other similar evidence to establish the existence of significant work within the claimant's capabilities). Moreover, Section 201.01 of the Grids applies only to individuals restricted to sedentary work. The ALJ determined that Plaintiff retained a residual functional capacity greater than of sedentary work, (R. at 239.) and this determination is supported by substantial evidence. Therefore, Section 201.01 of the Grids was inapplicable to Plaintiff.

36. Finally, Plaintiff argues the ALJ erred in failing to take notice of the finding of disability by the New Mexico Workers' Compensation Administration. The record does not establish that the Workers' Compensation Administration made a finding of disability. The ALJ inquired about the Plaintiff's workers' compensation case at the hearing. (R. at 249-51.) Plaintiff's current counsel represented that the attorneys handling the workers compensation claim reached a settlement agreement without a finding as to disability by the agency. (R. at 249.) Moreover, even if the state

15

agency had made a finding as to disability, it would not have been binding on the Commissioner. *See Baca v. Department of Health & Human Servs.*, 5 F.3d 476, 480 (10th Cir.1993) (disability findings by other agencies should be considered by ALJ but are not binding). In this case, the ALJ properly inquired into Plaintiff's workers compensation settlement and accorded it appropriate weight.

37. The ALJ's finding that Plaintiff is not disabled is supported by substantial evidence and is in accordance with the law.

## RECOMMENDED DISPOSITION

The ALJ applied the correct legal standards and the decision is supported by substantial evidence. I recommend that Plaintiff's Motion to Reverse and Remand for a Rehearing (Doc. 7), filed May 5, 2000, be denied, the decision of the ALJ affirmed, and this case dismissed. Timely objections to the foregoing may be made pursuant to 28 U.S.C. §636(b)(1)(C). Within ten days after a party is served with a copy of these proposed findings and recommendations that party may file with the Clerk of the District Court written objections to such proposed findings and recommendations. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommendations. If no objections are filed, no appellate review will be allowed.

_____
**LESLIE C. SMITH**
**UNITED STATES MAGISTRATE JUDGE**